1

2

3

4

5

6

7

8

9

10

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

11 | CHARLES A. MILLER,

12 |    Plaintiff,

13 | v.

14 | M. ADONIS, *et al.*,

15 |    Defendants.

16

17

Case No. 1:12-cv-00353-DAD-EPG-PC

FINDINGS AND RECOMMENDATION TO GRANT DEFENDANTS' MOTION TO STRIKE, GRANT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND DENY PLAINTIFF'S REQUESTS FOR JUDICIAL NOTICE

(ECF Nos. 110, 124, 140, 141)

OBJECTIONS, IF ANY, DUE WITHIN TWENTY DAYS

18     Plaintiff Charles A. Miller is a prisoner in the custody of the California Department of

19 Corrections and Rehabilitation. Plaintiff is proceeding *pro se* in this civil rights action pursuant

20 to 42 U.S.C. § 1983. Defendants Medina and Chudy move to strike the report of Plaintiff's

21 inmate-expert Darrell Eugene Harris and move for summary judgment on all remaining claims.

22 Plaintiff has filed two requests for judicial notice.

23     For the reasons stated herein, the undersigned recommends granting Defendants' motion

24 to strike and motion for summary judgment, and denying Plaintiff's requests for judicial notice.

**I.    BACKGROUND**

25

26     This case proceeds on Plaintiff's Third Amended Complaint ("TAC"), filed on July 31,

27 2015. (ECF No. 49) on the following claims and defendants:

28     a.    A claim of deliberate indifference under the Eighth Amendment, against

1

defendants Medina, Chudy, and Frederichs;

    b.    A claim under the Bane Act against defendant Medina;

(ECF No. 69; ECF Nos. 92, 93 (stipulating to dismissal of Defendants Eddings and Walker with prejudice)). These claims stem from Plaintiff's allegations that Defendant Chudy promulgates a policy of not providing prisoners wheelchairs and walkers despite their medical needs; Defendant Medina was aware of Plaintiff's medical needs and disregarded them by ordering Plaintiff to stand on his injured knee and that Plaintiff suffered injury as a result; and Defendant Medina threatened Plaintiff with disciplinary action if Plaintiff did not stand.

    On October 8, 2018, Defendants Medina and Chudy (collectively "Defendants") moved the Court for an order to strike the report of Plaintiff's inmate-expert Darrell Eugene Harris and to exclude any testimony of Mr. Harris. (ECF No. 110). Plaintiff filed an opposition, and Defendants filed a reply. (ECF Nos. 128, 131).

    On November 15, 2018, Defendants filed a motion for summary judgment on the entirety of Plaintiff's remaining claims. (ECF No. 124). Plaintiff filed oppositions, and Defendants filed a reply. (ECF Nos. 142, 145, 146).

## II.    RELEVANT FACTUAL ALLEGATIONS OF THIRD AMENDED COMPLAINT[1]

    Plaintiff's TAC alleges that following. On March 31, 2009, Plaintiff suffered an injury to his right knee while getting off an x-ray table at Community Regional Medical Center ("CRMC"). After many consultations, Plaintiff finally received the CT scan on May 29, 2009. It revealed fractures of the distal femur, proximal tibia, anterior subluxation, meniscus tears, bone density loss, and hypertrophic changes.

    On June 23, 2009, Dr. Menagral told Plaintiff about the results of his CT scan and renewed the comprehensive accommodation chrono for use of the wheelchair, walker, cane, and knee brace pending the orthopedic specialist examination.

    Plaintiff was transferred to the Correctional Training Facility ("CTF") on September 24,

---

[1] The following is a brief description of allegations as they concern the claims and defendants at issue. It does not include all allegations in the complaint.

2009. Before his transfer, Dr. I. Paja issued a Comprehensive Accommodation Chrono, physician's order, which ordered that Plaintiff be provided with a cane, knee brace, walker, and wheelchair for six months. It should have been effective until March 16, 2010.

On September 21, 2009, Plaintiff was summoned to the PVSP medical clinic and told to turn in the wheelchair, walker, knee brace, and cane for the purpose of being transferred to CTF on September 24, 2009. Plaintiff was told he could have these appliances at CTF. Plaintiff told the prison officials that he could not walk more than fifty feet without his knee giving out. Plaintiff was given a receipt for the wheelchair. However, no wheelchair was reissued to him at CTF upon his arrival.

On September 24, 2009, Plaintiff was transferred from PVSP to CTF without a lift as had been ordered by Dr. Paja and approved by prison officials. Upon arrival at CTF, R. Pascual told Plaintiff that CTF "does not accommodate wheelchair bound" prisoners and that no knee brace, wheelchair, or walker was available for him. Plaintiff was given a cane.

Plaintiff alleges that as of September 24, 2009, Defendant Chudy, the CTF Chief Medical Officer, was responsible for promulgating the policy of not providing prisoners in need of wheelchairs, walkers, and knee braces any appliances regardless of their medical needs.

Plaintiff filed multiple grievances at CTF requesting medical care and treatment. In the meantime, Plaintiff was walking on his right knee only using a cane for support for another five to six weeks.

Plaintiff saw a CTF physician, Dr. Ahmed, on November 25, 2009. Dr. Ahmed told Plaintiff he could not order him a wheelchair or walker because "CTF has an unwritten policy to the effect that we cannot accommodate prisoner's [sic] with wheelchair, or walker, needs." Dr. Ahmed further explained "it doesn't matter if you need a wheelchair, walker, or other orthopedic appliance in order to walk, you won't get one here. You'll need to be transferred someplace else." Plaintiff received similar responses to his 602 grievances, where prison officials indicated "CTF does not accommodate wheelchair bound Pt." Dr. Ahmed prescribed MS contin ("morphine") to Plaintiff. Dr. Ahmed also issued instructions that Plaintiff had a need for a cane, low-bunk, no stair usage, and no bending restrictions.

On January 29, 2010, Plaintiff met with an orthopedic specialist/surgeon named Dr. Donald Pompan, who recommended Plaintiff for arthroscopic surgery. Dr. Pompan notes that Plaintiff should be provided with a wheelchair and/or walker "if" or "when" needed. Nevertheless, the prison continued to deny Plaintiff's requests for a wheelchair and walker in 602 grievances.

On January 31, 2010, Defendant Medina, a prison guard, observed Plaintiff sitting on a wooden bench after the evening meal. The guard asked why Plaintiff was not standing. Plaintiff showed Defendant Medina proof of his medical problem. Nevertheless, Defendant Medina ordered Plaintiff to stand at his door anyway. After Plaintiff filed 602 grievances regarding Defendant Medina's conduct, Medina was told that Plaintiff could be seated in front of his cell when needed. Even after learning of this decision, Defendant Medina again ordered Plaintiff to stand by his cell door while waiting to go to the evening meal. Defendant Medina threatened Plaintiff with disciplinary action if he did not stand, and said that he (Medina) did not have to comply with the directive of his superiors. Plaintiff did as ordered but reinjured his menisci and suffered excruciating pain as a result.

## III.    MOTION TO STRIKE

Defendants move the Court for an order to strike the report of Plaintiff's inmate-expert Darrell Eugene Harris and to exclude any testimony of Mr. Harris on the basis that he is not qualified as an expert under Federal Rules of Evidence 104(a), 702, and 703, and Mr. Harris's opinions are not relevant and reliable under Federal Rules of Evidence 702 and 703, as well as the standards set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). (ECF No. 110).

### A.  Legal Standard

"Pursuant to the Federal Rules of Evidence, the district court judge must ensure that all admitted expert testimony is both relevant and reliable." Wendell v. GlaxoSmithKline LLC, 858 F.3d 1227, 1232 (9th Cir. 2017) (citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993)). "The court must decide any preliminary question about whether a witness is qualified," Fed. R. Evid. 104(a). Federal Rule of Evidence 702, which governs expert testimony, provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The proponent of the expert testimony bears the burden of establishing its admissibility. United States v. Vera, 770 F.3d 1232, 1243 (9th Cir. 2014); United States v. 87.98 Acres, 530 F.3d 899, 904 (9th Cir. 2008). "The determination whether an expert witness has sufficient qualifications to testify is a matter within the district court's discretion." United States v. Abonce-Barrera, 257 F.3d 959, 964 (9th Cir. 2001) (internal quotation marks omitted) (quoting United States v. Garcia, 7 F.3d 885, 889 (9th Cir. 1993)). "If an individual is not qualified to render an opinion on a particular question or subject, it follows that his opinion cannot assist the trier of fact with regard to that particular question or subject." Morin v. United States, 534 F. Supp. 2d 1179, 1185 (D. Nev. 2005), aff'd, 244 F. App'x 142 (9th Cir. 2007).

**B. Qualifications**

Plaintiff's proffered expert is Darrell Eugene Harris. Mr. Harris is a California state prisoner serving a nineteen-year sentence after being convicted of rape, incest, and battery. Harris v. Gipson, No. CV 12-0574-JFW (JEM), 2015 WL 5999255 (C.D. Cal. July 21, 2015), report and recommendation adopted, 2015 WL 5971548 (C.D. Cal. Oct. 13, 2015). Mr. Harris's alleged expertise derives from his pre-incarceration experience in the health care profession.

Mr. Harris declares that he was a certified nurse's assistant at Crestview Convalescence Hospital in Rialto, California from 1974 to 1976. (ECF No. 31 at 2). However, a search of the California Department of Public Health's L & C Verification Search Page returned no record of this certification. (ECF No. 110-8 at 2–3). Mr. Harris states that he obtained training as an emergency medical technician ("EMT") in 1978 and worked as an EMT at Mercy Ambulance

Company from 1978 to 1980. (ECF No. 31 at 2, 3). Yet neither the California Emergency Medical Services Authority nor San Bernardino County have any record of Mr. Harris's EMT certification. (ECF No. 110-9 at 2–3).

Mr. Harris states that he received a respiratory care practitioner's license in 1981 or 1982 and worked as a respiratory care practitioner at the San Bernardino County Hospital from 1980 to 1986. Mr. Harris declares that he was certified in neonatal care in 1986 through the NICU program at San Antonio Hospital in Upland, California and was employed there from 1986 to 1990. Harris states he then worked as a respiratory therapist through Allied Health Professions from 1990 to 1999. (ECF No. 31 at 2, 3). The Respiratory Care Board of California certified that Mr. Harris was issued a respiratory care license in 1986, and the license was cancelled with an expiration date of December 31, 1999 due to non-renewal of said license for three consecutive years. (ECF No. 110-10 at 2).

Mr. Harris claims that he worked as a certified nurse's assistant for two years and as a certified EMT for two years. Mr. Harris received a respiratory care practitioners license in 1986.

### C.  Analysis of Mr. Harris' Relevant Expertise

The question before this Court is whether Mr. Harris is qualified to testify regarding the condition of Plaintiff's knee and the orthopedic care Plaintiff received. (ECF No. 110-12 (explaining how Mr. Harris was asked to provide an opinion "whether any employee, or independent contracting worker, at the CDCR Pleasant Valley State Prison (PVSP) . . . caused Charles A. Miller to be denied reasonably immediate and urgent follow up orthopedic consultation, care and treatment at Community Regional Medical Center-Fresno hospital . . . as a result of acts or omissions that, to a degree of medical certainty, fell below the acceptable standard of care"). Here, Plaintiff has not demonstrated that Mr. Harris has an understanding of the field of orthopedics sufficient to provide such an opinion. He thus has not established that he has the necessary expertise to determine the proper medical care for Plaintiff's knee injury in this case.

Based on Mr. Harris's report, qualifications, and experience, the Court recommends finding that Mr. Harris has failed to establish sufficient expertise with respect to the field of

orthopedics to give a medical opinion on that subject in this case. See, e.g., Avila v. Willits

Envtl. Remediation Tr., 633 F.3d 828, 839 (9th Cir. 2011) (finding witness, who had degrees in

chemistry and specialized in cancer immunology and biology, basic and clinical immunology,

and medical toxicology, lacked expertise to opine on whether burning solvents at defendant

company's sites resulted in toxic amounts of dioxins because witness had no special training or

knowledge regarding metal working industries); United States v. Redlightning, 624 F.3d 1090,

1115 (9th Cir. 2010) (finding expert neuropsychiatrist, whose expertise included analysis of

defendant's mental condition, was not qualified to testify about physical symptoms of

hypoglycemia or whether defendant was susceptible to giving false confession during a police

interrogation); United States v. Chang, 207 F.3d 1169, 1172–73 (9th Cir. 2000) (finding

"extremely qualified" international finance expert was properly precluded from testifying about

authenticity of certificate at issue because detection/identification of counterfeit securities was

beyond witness's expertise).

Accordingly, the undersigned recommends that the motion to strike be granted, Mr.

Harris's report be stricken, and any testimony of Mr. Harris be excluded.

## IV.     REQUESTS FOR JUDICIAL NOTICE

Plaintiff requests that the Court take judicial notice of, *inter alia*, the factual allegations

made in each paragraph of his original complaint filed in the Fresno County Superior Court and

the factual allegations contained in the Third Amended Complaint. (ECF No. 140 at 2, 4).

Defendants object, arguing that Plaintiff can support his opposition by simply citing to

depositions, documents, affidavits, declarations, or discovery responses, but cannot use judicial

notice to establish the veracity of Plaintiff's arguments contained in his prior filings.

"The court may judicially notice a fact that is not subject to reasonable dispute because

it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately

and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R.

Evid. 201(b). Documents that are part of the public record may be judicially noticed to show,

for example, that a judicial proceeding occurred or that a document was filed in another court

case, but a court may not take judicial notice of findings of facts from another case. See Wyatt

1  v. Terhune, 315 F.3d 1108, 1114 & n.5 (9th Cir. 2003), overruled on other grounds by Albino v.

2  Baca, 747 F.3d 1162 (9th Cir. 2014) (en banc); Lee v. City of Los Angeles, 250 F.3d 668, 689

3  (9th Cir. 2001). Nor may the Court take judicial notice of any matter that is in dispute. Lee, 250

4  F.3d at 689-90; Lozano v. Ashcroft, 258 F.3d 1160, 1165 (10th Cir. 2001).

5      Because "a court can only take judicial notice of the *existence* of those matters of public

6  record (the existence of a motion or of representations having been made therein), but not of the

7  *veracity* of the arguments and disputed facts contained therein," the Court should deny

8  Plaintiff's request for judicial notice.[2] United States v. S. Cal. Edison Co., 300 F.Supp.2d 964,

9  974 (E.D. Cal. 2004).

10      Plaintiff also requests that the Court take judicial notice of Darrell Harris's declaration

11  and opinions included in his September 27, 2013 report. (ECF No. 141). As discussed in section

12  III, *supra*, the undersigned recommends that Mr. Harris's report be stricken because Mr. Harris

13  does not qualify as an expert in the appropriate field. Further, Plaintiff has not established that

14  Mr. Harris's declaration and opinions are "not subject to reasonable dispute." Fed. R. Evid.

15  201(b). Accordingly, Plaintiff's request for judicial notice should be denied.

16  **V.    MOTION FOR SUMMARY JUDGMENT**

17      Defendants move for summary judgment on the entirety of Plaintiff's remaining claims.

18  Defendants argue that Plaintiff failed to exhaust his administrative remedies on some claims in

19  addition to failing to establish necessary elements of his Eighth Amendment deliberate

20  indifference and Bane Act claims.

21      **A.  Legal Standards**

22          1. Summary Judgment

23      Summary judgment is appropriate when it is demonstrated that there "is no genuine

24  dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

25  R. Civ. P. 56(a); Albino v. Baca ("Albino II"), 747 F.3d 1162, 1169 (9th Cir. 2014) (en banc)

26  ("If there is a genuine dispute about material facts, summary judgment will not be granted."). A

27  [2] The Court notes that Plaintiff has supported his opposition to summary judgment with citations to evidence and
28  various documents in the record, which the undersigned has reviewed in determining the summary judgment
    recommendation.

party asserting that a fact cannot be disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). If the moving party moves for summary judgment on the basis that a material fact lacks any proof, the Court must determine whether a fair-minded fact-finder could reasonably find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [fact-finder] could reasonably find for the plaintiff."). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 322. "[C]onclusory allegations unsupported by factual data" are not enough to rebut a summary judgment motion. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989) (citing Angel v. Seattle-First Nat'l Bank, 653 F.2d 1293, 1299 (9th Cir. 1981)).

In reviewing a summary judgment motion, the Court may consider other materials in the record not cited to by the parties, but is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001). In judging the evidence at the summary judgment stage, the Court "must draw all reasonable inferences in the light most favorable to the nonmoving party." Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011). It need only draw inferences, however, where there is "evidence in the record . . . from which a reasonable inference . . . may be drawn"; the court need not entertain inferences that are unsupported by fact. Celotex, 477 U.S.

at 330 n.2 (quoting In re Japanese Elec. Prods. Antitrust Litig., 723 F.2d 238, 258 (3d Cir. 1983)).

2.Eighth Amendment Medical Care

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). The two-part test for deliberate indifference requires the plaintiff to show (1) "'a serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need was deliberately indifferent." Jett, 439 F.3d at 1096 (quoting McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal quotations omitted)). Deliberate indifference can be established "by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." Jett, 439 F.3d at 1096 (citing McGuckin, 974 F.2d at 1060). Deliberate indifference may be manifested "when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." Jett, 439 F.3d at 1096 (quoting McGuckin, 974 F.2d at 1059). Where a prisoner is alleging a delay in receiving medical treatment, the delay must have led to further harm in order for the prisoner to make a claim of deliberate indifference to serious medical needs. McGuckin, 974 F.2d at 1060 (citing Shapely v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985)).

"Deliberate indifference is a high legal standard." Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004). "A showing of medical malpractice or negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment." Id. "[E]ven gross negligence is insufficient to establish a constitutional violation." Id. (citing Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990))

"A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim." Franklin v. Oregon, 662 F.2d 1337,

1344 (9th Cir. 1981) (internal citation omitted). To prevail, Plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances . . . and . . . that they chose this course in conscious disregard of an excessive risk to plaintiff's health." Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996) (internal citations omitted).

### 3. Bane Act

California's Bane Act, Civil Code § 52.1, provides:

> (a) If a person or persons, whether or not acting under color of law, interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state, the Attorney General, or any district attorney or city attorney may bring a civil action for injunctive and other appropriate equitable relief in the name of the people of the State of California, in order to protect the peaceable exercise or enjoyment of the right or rights secured. . . .

> (b) Any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with, as described in subdivision (a), may institute and prosecute in his or her own name and on his or her own behalf a civil action . . . to eliminate a pattern or practice of conduct as described in subdivision (a).

Cal. Civ. Code, § 52.1. "The essence of such a claim is that 'the defendant, by the specified improper means . . . tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or force the plaintiff to do something he or she was not required to do.'" Boarman v. County of Sacramento, 55 F. Supp. 3d 1271, 1287 (E.D. Cal. 2014) (quoting Austin B. v. Escondido Union Sch. Dist., 149 Cal. App. 4th 860, 883 (2007)). The key element in Bane Act cases is "the element of threat, intimidation, or coercion." Shoyoye v. County of Los Angeles, 203 Cal. App. 4th 947, 959 (2012). "The act of interference with a constitutional right must itself be deliberate or spiteful." Id. "The statute requires a showing of coercion independent from the coercion inherent in the wrongful detention [or other tort] itself." Id.

\\\
\\\

4.Exhaustion

"The California prison grievance system has three levels of review; an inmate exhausts administrative remedies by obtaining a decision at each level." Reyes v. Smith, 810 F.3d 654, 657 (9th Cir. 2016) (citing Cal. Code Regs. tit. 15, § 3084.1(b) (2011), and Harvey v. Jordan, 605 F.3d 681, 683 (9th Cir. 2010)). See also Cal. Code Regs. tit. 15, § 3084.7(d)(3) ("The third level review constitutes the decision of the Secretary of the California Department of Corrections and Rehabilitation on an appeal, and shall be conducted by a designated representative under the supervision of the third level Appeals Chief or equivalent. The third level of review exhausts administrative remedies . . . .").

Section 1997e(a) of the Prison Litigation Reform Act of 1995 ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

Prisoners are required to exhaust the available administrative remedies prior to filing suit. Jones v. Bock, 549 U.S. 199, 211 (2007); McKinney v. Carey, 311 F.3d 1198, 1199–1201 (9th Cir. 2002) (per curiam). The exhaustion requirement applies to all prisoner suits relating to prison life. Porter v. Nussle, 534 U.S. 516, 532 (2002). Exhaustion is required regardless of the relief sought by the prisoner and regardless of the relief offered by the process, unless "the relevant administrative procedure lacks authority to provide any relief or to take any action whatsoever in response to a complaint." Booth v. Churner, 532 U.S. 731, 736, 741 (2001); Ross v. Blake, 136 S. Ct. 1850, 1857, 1859 (2016).

"Under the PLRA, a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought. The grievance need not include legal terminology or legal theories, because [t]he primary purpose of a grievance is to alert the prison to a problem and facilitate its resolution, not to lay groundwork for litigation. The grievance process is only required to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued." Reyes, 810 F.3d at 659 (alteration in original) (citations and quotation marks omitted).

As discussed in Ross, 136 S. Ct. at 1862, there are no "special circumstances"

exceptions to the exhaustion requirement. The one significant qualifier is that "the remedies must indeed be 'available' to the prisoner." Id. at 1856. The Ross Court described this qualification as follows:

> [A]n administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates. See 532 U.S., at 736, 738, 121 S.Ct. 1819. . . .
>
> Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. . . .
>
> And finally, the same is true when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation. . . . As all those courts have recognized, such interference with an inmate's pursuit of relief renders the administrative process unavailable. And then, once again, § 1997e(a) poses no bar.

Id. at 1859–60.

"When prison officials improperly fail to process a prisoner's grievance, the prisoner is deemed to have exhausted available administrative remedies." Andres v. Marshall, 867 F.3d 1076, 1079 (9th Cir. 2017). If the Court concludes that Plaintiff has failed to exhaust, the proper remedy is dismissal without prejudice of the portions of the complaint barred by § 1997e(a). Jones, 549 U.S. at 223–24; Lira v. Herrera, 427 F.3d 1164, 1175–76 (9th Cir. 2005).

In a summary judgment motion for failure to exhaust, the defendants have the initial burden to prove "that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy." Albino II, 747 F.3d at 1172. If the defendants carry that burden, "the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." Id. However, "the ultimate burden of proof remains with the defendant." Id. "If material facts are disputed, summary judgment should be denied, and the district judge rather than a jury should determine the facts." Id. at 1166.

\\\

\\\

## B. Objections to Evidence

To the extent the Court necessarily relied on evidence that has been objected to, the Court relied only on evidence it considered to be admissible. It is not the practice of the Court to rule on evidentiary matters individually in the context of summary judgment.[3] This is particularly true when "many of the objections are boilerplate recitations of evidentiary principles or blanket objections without analysis applied to specific items of evidence." Capital Records, LLC v. BlueBeat, Inc., 765 F.Supp.2d 1198, 1200 n.1 (C.D. Cal. 2010) (quoting Doe v. Starbucks, Inc., 2009 WL 5183773, at *1 (C.D. Cal. Dec. 18, 2009)).

## C. Defendant Chudy

Defendants argue that Plaintiff cannot establish any element of his Eighth Amendment deliberate indifference claim against Defendant Chudy. Defendants contend that Plaintiff has no proof of an unconstitutional policy, Plaintiff had no medical need for a wheelchair or walker, and Plaintiff cannot prove harm attributable to Defendant Chudy's conduct. (ECF No. 124 at 25–29).[4]

### 1. *Armstrong* Remedial Plan

Defendants assert that Plaintiff has no evidence of a formal unconstitutional policy denying inmates medically necessary wheelchairs or walkers. (ECF No. 124 at 25–26). In support of the motion for summary judgment, Defendant Chudy submits a declaration under penalty of perjury. (Chudy Decl., ECF No. 124-6). In pertinent part, Defendant Chudy declares that the Armstrong[5] Remedial Plan and CTF's Operational Procedure #035[6] describe CDCR and CTF's Disability Placement Program, which is the set of plans, policies, and procedures to assure nondiscrimination against inmates with disabilities. (Id. ¶¶ 5, 7, 13).

---

[3] In the instant case, however, the Court has ruled on the specific evidentiary matters raised in Defendants' motion to strike and Plaintiff's requests for judicial notice.

[4] The Court notes that the screening order allowed Plaintiff to proceed on an Eighth Amendment *policy* claim, finding that the "TAC states a cognizable claim against Defendant Chudy . . . for promulgating the policy of not providing prisoners in need of wheelchairs, walkers and knee braces any appliances despite need." (ECF No. 67 at 11–12, 13). Therefore, the issue before the Court is not whether Defendant Chudy misapplied or violated the Armstrong Remedial Plan as to any *individualized* wheelchair/walker determination regarding Plaintiff.

[5] Armstrong is an ongoing federal class action lawsuit filed on behalf of disabled inmates and parolees seeking accommodations under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act. See Armstrong v. Brown, 732 F.3d 955 (9th Cir. 2013).

[6] Operational Procedure #035 reiterates the Armstrong Remedial Plan. (Chudy Decl. ¶ 14).

Although the Disability Placement Program "covers all inmates/parolees with disabilities, whether or not they require special placement or other accommodation, it is facilitated in part through 'clustering' or designating accessible sites (designated facilities) for qualified inmates requiring special placement." (ECF No. 124-7 at 6).

The Armstrong Remedial Plan provides the following category designations for "Permanent Wheelchair" users (defined as "inmates/parolees who use wheelchairs full or part time due to a permanent disability"):

**DPW – Wheelchair Dependent**: Inmates/parolees who are medically prescribed a wheelchair for full time use both within and outside the assigned cell due to a permanent disability shall be designated as DPW. All designated DPW inmates/parolees must be housed in a designated facility and require housing in a wheelchair accessible cell.

**DPM – Mobility Impaired**: Inmates/parolees who do not require a wheelchair full time but are medically prescribed a wheelchair for use outside of the assigned cell, due to a permanent lower extremity mobility impairment that substantially limits walking, shall be designated as DPM. All designated DPM inmates/parolees require housing in a designated facility but do not require housing in a wheelchair accessible cell. However, these inmates may require in-cell accommodation, e.g., grab bars or raised toilet seats as documented on a CDC Form 1845 or 128C.

**DPO – Other**: Inmates/parolees who do not require a wheelchair full time but are medically prescribed a wheelchair for use outside of the assigned cell, due to a disability other than a lower extremity mobility impairment, i.e., emphysema, serious heart condition, etc., who, due to the severity of their disability, require placement in a designated facility, shall be designated as DPO. All designated DPO inmates/parolees require housing in a designated facility but do not require housing in a wheelchair accessible cell. However, these inmates may require in-cell accommodation, e.g., grab bars or raised toilet seats as documented on a CDC Form 1845 or 128C.

(ECF No. 124-7 at 7). "Permanent Wheelchair" users require special placement in designated facilities. Separate from "Permanent Wheelchair" users are "Permanent Mobility Impairments" inmates designated as "DNM" with permanent lower extremity mobility impairments who can walk 100 yards and up a flight of stairs without pausing, with or without aids, and who do not require special placement in designated facilities. (ECF No. 124-7 at 9).

In his amended opposition, Plaintiff clarifies that the alleged "no wheelchair/walker policy" was an "unwritten policy, practice, plan, and/or rule" and violated the Armstrong

Remedial Plan. (ECF No. 145 at 9, 22).

Therefore, there is no dispute of fact between the parties regarding the existence and constitutionality of CTF's formal policy regarding inmates with disabilities, *i.e.*, the <u>Armstrong</u> Remedial Plan. Rather, the issue is whether there was an unwritten, informal policy or practice of not providing wheelchairs or walkers to inmates despite medical need.

### 2. <u>Existence of Unwritten Policy</u>

Defendants assert that Plaintiff cannot establish an unwritten policy or "unconstitutional practice at CTF of denying inmates medically necessary wheelchairs—because he personally knew of and saw other inmates at CTF who were using wheelchairs and walkers." (ECF No. 124 at 26). Defendants also argue that to the extent Plaintiff relies on "statements of non-defendant medical staff to establish a policy, those statements are hearsay without exception to the rule against admissibility." (<u>Id.</u>).

In support of his claim of an unwritten policy, Plaintiff relies on a notation—"CTF does not accommodate wheelchair bound pt."—in a first level response to one of his grievances in addition to statements made to Plaintiff by CTF R&R personnel on September 24, 2009 and by Dr. Ahmed on November 25, 2009 in denying Plaintiff a wheelchair. (ECF No. 145 at 18) (citing Pl.'s Dep. 74:14–158:2, 158:10–197:2; Vivo Decl. ¶¶ 1–52; Romero Decl. ¶¶ 1–14). Specifically, Plaintiff relies on a 602 grievance form logged as CTF-09-13540 that was submitted by Plaintiff on November 8, 2009. (ECF No. 124-7 at 62). Therein, Plaintiff raised the following problems: (1) CTF medical staff's failure to provide medical equipment and supplies for which Plaintiff was approved at PVSP as set forth in a September 16, 2009 comprehensive accommodation chrono; and (2) the lack of a visitation with a physician even after Plaintiff's numerous requests. (<u>Id.</u>). Plaintiff asked for the following relief: $250,000 in money damages, that he be seen by a physician immediately, and be provided a low bed, a knee brace, a walker (if not a wheelchair), and a cotton blanket. (<u>Id.</u>).

In the first level response to CTF-09-13540, Registered Nurse L. Fernandez wrote *inter alia* that "CTF does not accommodate wheelchair bound pt." (ECF No. 124-7 at 61). In the second level response, Defendant Chudy wrote: "CTF is not a designated Institution for wheel

chair accessibility. Patients evaluated for a permanent disability will be indicated on a new 1845 Disability Placement Program Verification (DPPV) and submitted for approval. This may or not impact placement here at CTF." (ECF No. 124-7 at 63). Defendant Chudy declares that he understood "this statement to mean that CTF is not a designated institution for Permanent Wheelchair users under the *Armstrong* Remedial Plan." (Chudy Decl. ¶ 44). Defendant Chudy further declares that "[n]either the *Armstrong* Remedial Plan nor CTF's Operational Procedure #035 refuse to accommodate wheelchair bound prisoners regardless of their medical needs. I know of no such policy of CDCR or at CTF. I have never, during my tenure as Chief Medical Officer or otherwise, promulgated or enforced such a policy on behalf of CDCR or at CTF." (Chudy Decl. ¶ 15).

Plaintiff also relies on his own testimony that Nurse Fernandez told him during the interview regarding grievance CTF-09-13540 that CTF does not accommodate wheelchair bound patients, but Fernandez did not explain, and Plaintiff did not ask, what she meant by "wheelchair bound patient." (Pl.'s Dep. 167:2–9, ECF No. 124-4). Similarly, Plaintiff did not ask Defendant Chudy what Chudy meant when he stated that "CTF is not a designated institution for wheelchair accessibility." (Pl.'s Dep. 174:9–12).

Plaintiff's reliance on statements made to him[7] and other inmates[8] by CTF personnel are not sufficient to raise a genuine dispute as to the existence of an unwritten policy of not providing wheelchairs or walkers to inmates despite medical need. Plaintiff seeks to use the statements of out-of-court declarants for the truth of the matter provided therein—they are classic hearsay statements and thus, inadmissible and should not be considered on the motion for summary judgment. United States v. Torres, 794 F.3d 1053, 1059 (9th Cir. 2015); Fed. R. Evid. 801(c), 802. To be considered on a motion for summary judgment, any evidence must be

---

[7] Plaintiff has stated that Nurse Fernandez, Nurse Ragasa, and Dr. Ahmed told Plaintiff "that an unwritten policy at CTF existed which prohibited them from issuing a wheelchair or walker" to Plaintiff. (Pl.'s Resp. to Def. Chudy's interrog. No. 2, ECF No. 124-4 at 9). Plaintiff testified, however, that none of the medical staff that mentioned the no wheelchair policy ever specifically said it was Defendant Chudy who was enforcing the policy. (Pl.'s Dep. 159:17–23).

[8] Steve Romero declared that he was present on September 24, 2009 when CTF R&R personnel told Plaintiff "they do not accommodate prisoners with physical handicaps or disabilities and that they would not be issuing him any knee brace, walker, or wheelchair." (Romero Decl. ¶ 10, ECF No. 137). John Eric Vivo declared that he was present on September 24, 2009 when CTF R&R personnel told Plaintiff something to the effect of "good luck, [because] we don't have any of those things [wheelchair, walker, knee brace] here at CTF." (Vivo Decl. ¶ 36, ECF No. 139).

capable of reduction to an admissible form at trial. There is no indication that Plaintiff can reduce these hearsay statements of CTF personnel to an admissible form for trial. See, e.g., JL Beverage Co. LLC., v. Jim Beam Brands Co., 828 F.3d 1098, 1110 (9th Cir. 2016) (finding hearsay statements not subject to exception were properly disregarded at summary judgment where party did not argue the out-of-court declarants would be available to testify at trial).

Moreover, Plaintiff has testified seeing other inmates at CTF with walkers and wheelchairs in addition to submitting a declaration from an inmate who had a walker at CTF. (Pl.'s Dep. 166:14–167:16; Rojo Decl. ¶ 5, ECF No. 136). This evidence undermines Plaintiff's claim of an unwritten policy of not providing wheelchairs or walkers to inmates despite medical need.

Based on the foregoing, the Court finds that Defendants have established that there is no genuine dispute as to the nonexistence of an unwritten policy of not providing wheelchairs or walkers to inmates despite medical need. See Anderson, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [fact-finder] could reasonably find for the plaintiff."). Therefore, the undersigned recommends granting Defendant's motion for summary judgment as to the Eighth Amendment claim against Defendant Chudy.[9]

### D. Defendant Medina

In their motion for summary judgment, Defendants contend that Plaintiff's claims arising from the March 2010 encounters with Defendant Medina are not exhausted. Defendants also argue that Plaintiff fails to establish Defendant Medina's deliberate indifference and cannot prove harm attributable to Defendant Medina's conduct. (ECF No. 124 at 31–35). Defendants further argue that Plaintiff's Bane Act claim fails on its merits, fails to satisfy the California Government Claims Act, and fails in light of California statutory immunities. (Id. at 35–38).

#### 1. January 31, 2010 Encounter

It is undisputed that on January 31, 2010, Plaintiff sat on the wooden benches six to

---

[9] Accordingly, the Court declines to address the other grounds raised by Defendants in support of summary judgment with respect to the claim against Defendant Chudy.

eight feet from Plaintiff's cell door when returning from the dining hall after the evening meal. (Pl.'s Dep. 95:9–97:22, ECF No. 124-4; Medina Decl. ¶ 28, ECF No. 124-8). Plaintiff was not sitting in a wheelchair. (Pl.'s Dep. 102:13–17; Medina Decl. ¶ 31). Defendant Medina directed Plaintiff to stand by his cell door, and Plaintiff informed Medina that he had an accommodation chrono. (Pl.'s Dep. 103:7–104:14).

The parties dispute what occurred next. Plaintiff testified that he stood and there was a thirty-second pause until his cell door opened. (Pl.'s Dep. 104:15–105:8). Defendant Medina declared that Plaintiff was allowed to remain seated until his cell was opened. (Medina Decl. ¶ 29).

Plaintiff then retrieved his accommodation documents from his cell and showed them to Defendant Medina. (Pl.'s Dep. 104:19–105:8; Medina Decl. ¶ 29). Plaintiff testified that he showed Defendant Medina six documents—the April 6, 2009 notes, order, and accommodation chronos; the June 2009 records; and the September 9, 2009 chrono—but Plaintiff had not yet received his more recent January 12, 2010 chrono to show to Medina. (Pl.'s Dep. 105:9–107:18). Defendant Medina declared that Plaintiff only showed him two chronos. The first stated Plaintiff's physical limitations for his job assignments; the second, from PVSP dated September 9, 2009, stated no running, walking more than fifteen minutes, and climbing stairs. (Medina Decl. ¶ 29).

Defendant Medina declared that neither chrono indicated that Plaintiff could not stand for any length of time. (Medina Decl. ¶ 29). Plaintiff acknowledged that none of the documents shown to Medina indicated how long Plaintiff could stand. (Pl.'s Dep. 105:9–107:18). At no time during this encounter did Plaintiff request to be sent to medical due to knee pain because "[t]here was no reason for it." (Pl.'s Dep. 114:14–20).

Thereafter, Plaintiff submitted a 602 grievance regarding the January 31, 2010 encounter with Defendant Medina. (ECF No. 124-9 at 6). When Defendant Medina received the 602 grievance on February 2, 2010, he called medical to ask about Plaintiff's status. Defendant Medina spoke with Registered Nurse Stringer, who informed Medina that Plaintiff's medical file did not indicate any limitations regarding Plaintiff standing. (Medina Decl. ¶ 32; ECF No.

124-9 at 6). Based on this information, Defendant Medina denied Plaintiff's 602 at the informal level.

Deliberate indifference is established only where the defendant subjectively "knows of and disregards an excessive risk to inmate health and safety." Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) (internal quotation mark omitted) (quoting Gibson v. County of Washoe, Nevada, 290 F.3d 1175, 1187 (9th Cir. 2002)). Deliberate indifference can be established "by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." Jett, 439 F.3d at 1096.

Although the parties dispute whether Plaintiff stood during a thirty-second pause while his cell door opened or whether he was allowed to remain seated, that dispute is not material. Even assuming that Plaintiff was required to stand, there is no evidence establishing that Defendant Medina knew of an excessive risk to Plaintiff's health and safety. Plaintiff's medical documentation from that date did not indicate any limitations to Plaintiff's standing.

Moreover, Plaintiff has not established any harm from the alleged indifference. There is no evidence that Plaintiff was harmed by Defendant Medina's failure to allow Plaintiff to remain seated during the thirty-second pause while his cell door opened. As Plaintiff testified, at no time during this encounter did Plaintiff request to be sent to medical due to knee pain because "[t]here was no reason for it." (Pl.'s Dep. 114:14–20).

Based on the foregoing, the undersigned recommends granting Defendants' motion for summary judgment as to the Eighth Amendment claim against Defendant Medina arising from the January 31, 2010 encounter.

2. March 2010 Encounters

After Plaintiff's 602 grievance regarding the January 31, 2010 encounter was denied at the informal level by Defendant Medina, Plaintiff appealed to the formal level of review. At the first level of review, Plaintiff was interviewed by Sergeant Ranucci, who partially granted the 602. On March 4, 2010, Plaintiff received written authorization from Sergeant Ranucci "to sit outside of his cell upon releases and lockups, at the nearest seat until staff conducts movement due to his medical condition." (ECF No. 124-11 at 63; Pl.'s Dep. 132:7–19).

Plaintiff testified that sometime after March 4 but before March 21, Plaintiff returned from dining hall release and sat on the floor outside another inmate's cell because his knee was exhausted. Defendant Medina told Plaintiff to get up. Plaintiff then showed Medina the written authorization from Sergeant Ranucci, but Medina continued to order Plaintiff to stand by his door. (Pl.'s Dep. 136–141).

Plaintiff testified that on March 21, 2010, his knee gave out when he was in front of his cell, so he sat down on the floor. Defendant Medina approached Plaintiff and told him to stand up. Plaintiff informed Medina that his knee gave out. (Pl.'s Dep. 142:8–145:23). Plaintiff testified that in response Medina stated, "I've told you, stand by yourself. Stand by your cell. You know what, you got to go to chow. . . . I'm green wall.[10] You're going to do what I say." (Pl.'s Dep. 147:16–19). Plaintiff did not request to be sent to medical or go man down because medical would just give him ice and Plaintiff could be disciplined for going man down if prison officials believed it was false. (Pl.'s Dep. 146:5–17, 148:7–22).

Defendant Medina declared that he does not recall the specifics of either of these encounters or being shown a logbook entry or note from Sergeant Ranucci stating that Plaintiff could sit instead of stand during release and lockup. (Medina Decl. ¶ 35).

### a. Judicial Estoppel

Defendants assert that Plaintiff failed to exhaust his claims arising from the March 2010 encounters with Defendant Medina. (ECF No. 124 at 19–23). Plaintiff argues that Defendants should be judicially estopped from asserting an exhaustion defense because during Plaintiff's deposition, counsel for Defendants "lulled [Plaintiff] into the belief exhaustion would not be disputed." (ECF No. 145 at 19).

Judicial estoppel is "an equitable doctrine invoked by a court at its discretion," the purpose of which is "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." New Hampshire v. Maine, 532 U.S. 742, 749–50 (2001) (internal quotation marks and citation omitted). The

_____

[10] Plaintiff testified that he understood "green wall" as a reference to the "prison guard gang." (Pl.'s Dep. 148:3–6).

Supreme Court has identified the following three non-exhaustive factors that "typically inform the decision whether to apply the doctrine in a particular case": (1) "a party's later position must be 'clearly inconsistent' with its earlier position"; (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled'"; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." Id. at 750–51 (internal quotation marks and citation omitted).

Here, Plaintiff cites to portions of his deposition transcript to support his argument that Defendants' assertion of the exhaustion defense is inconsistent with statements made by Defendants' counsel during Plaintiff's deposition. (ECF No. 145 at 19). The pertinent portions of the transcript provide:

> **Q. Let me do a little aside and then we'll come back to January 31st. You have two appeals that look -- that to me are identical as far as the form. It's your appeal 10, a log number 10-00374 and 10-00375.**
>
> A. Uh-huh.
>
> **Q. You produced the 74, which I had not seen before because I'm not sure what happened to it. But the first, the page 1 and 2 of the 602 form** --
>
> A. Uh-huh.
>
> **Q. -- is identical to the first two pages of 375.**
>
> A. Absolutely.
>
> **Q. And it looks like 374 was screened out?**
>
> A. Uh-huh.
>
> **Q. And then you filed a 375, but I'm not sure -- so can you just, without getting too much detail, because I'm not questioning exhaustion, exhaustion is not an issue.**
>
> A. Right.

**Q. I just want to understand why there's 374 and why there's 375 if the form complaint is the same.**

A. The original 374, okay --

**Q. Uh-huh.**

A. -- is the 602 that I actually submitted --

**Q. Uh-huh.**

A. -- on the green form. So what happens is it goes in and goes to the appeals coordinator and the appeals coordinator, Mr. Mullins decides, "This is not a medical. This is not -- this is a staff complaint." So when they first received it, they stamped it CTFS1000374. It was a medical. He screens out the medical one and sends me -- I'm trying to find it. Sends me back 375, he gives them -- he sends them back, see 375, he decided -- they decided as the stamp up here reviewed by hiring authority, what they did is they made 375 a staff complaint. I didn't do a staff complaint.

A. They copied 374. That's why 374 and 375 are both dated the same day. I didn't submit two 602s. I submitted one 602.

**Q. Right. That's what I'm saying, though, the form part is identical.**

A. Right.

**Q. It looks like it was copied.**

A. Right.

**Q. That's why I'm just trying to understand what happened to 374 because somewhere it stopped and 375 went all the way up to the third level.**

A. Yes. I'm looking for 374 right here.

**Q. So was this a disagreement as to the categorization as to whether this was a staff complaint, medical issue or an ADA issue?**

A. I don't think it's a -- it's not a disagreement. I don't get no choice in the matter.

**Q. Right, that's what I'm saying.**

A. They make the decision to screen it out and make it a staff complaint, okay, as opposed to a medical issue. So then they -- instead of seeing -- if they had processed this medical issue, it would have been sent to the

medical department and custody wouldn't have been responsible for it. The 375 would not have been routed to the lieutenant and the sergeant. But they routed it to the -- the 375 went to the lieutenant and the sergeant as a staff complaint. That's why Lieutenant Ranucci and Lieutenant Caravello came and got me.

**Q. But somewhere it stopped being a staff complaint because it became an ADA** -- you see at the top there it's dated March 4, 2010?

A. Yes, ma'am.

**Q. And CDC 1824, reasonable modification or accommodation request. So I'm not contesting exhaustion, I'm just trying to understand what happened to 374 and how this evolved into an ADA issue.**

(Pl.'s Dep. 110:17–113:17).

The Court appreciates Plaintiff's argument that Defendants appear inconsistent in saying during questioning that "I'm not contesting exhaustion" and then filing a motion for summary judgment on the basis of exhaustion. However, this is not sufficient to apply the doctrine of judicial estoppel. First of all, it is not clear from these statements that Defendants were voluntarily waiving any argument regarding exhaustion—rather than directing Plaintiff's attention on an issue other than exhaustion at that time. Regardless, even if the Court accepts that Defendants' current position is clearly inconsistent with counsel's position as set forth in her statements at the deposition, the Court finds that the other two factors weigh against applying judicial estoppel.

With respect to the second factor, Defendants have not succeeded in persuading a court to accept counsel's earlier position. Defense counsel made these statements at a deposition, in a part of questioning Plaintiff. Defense counsel did not make any such statements to the Court, and did not persuade the Court to accept any position on the issue.

With respect to the third factor, the Court finds that Defendants did not derive an unfair advantage or impose an unfair detriment to Plaintiff. Plaintiff does not describe how he would have changed his answer to the deposition questions if he had realized that exhaustion was an issue. Plaintiff argues that due to counsel's statement he "did not devote attention to carefully

articulating how he" exhausted his claims at the deposition. (ECF No. 145 at 19). However, Plaintiff had ample opportunity to respond to the exhaustion defense in his opposition to the motion for summary judgment. Moreover, Defendants are not relying on any admission unfairly gained during the deposition to prove their exhaustion defense.

Thus, while Defendants may have made statements that led Plaintiff to believe exhaustion would not be an issue, those statements are not sufficient to bar Defendants from raising the defense under the doctrine of judicial estoppel. Accordingly, the Court should decline to apply judicial estoppel. See Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154, 170 (2010) (declining to apply judicial estoppel despite the parties' prior statements being "in tension" with their current arguments because the "doctrine typically applies when, among other things, a 'party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled'").

### b. Exhaustion of Prison Administrative Remedies

Turning to the merits of the exhaustion issue, Defendants assert that although Plaintiff pursued his administrative remedies on the initial January 31, 2010 encounter with Defendant Medina, Plaintiff failed to exhaust his claims arising from the March 2010 encounters. (ECF No. 124 at 19). Plaintiff argues that he was not required to pursue separate administrative grievances for each encounter because the incidents between January 31, 2010 and March 30, 2010 constitute ongoing misconduct by Defendant Medina. Plaintiff also contends that he believed that separate grievances for each encounter would be deemed duplicative and canceled. (ECF No. 145 at 19).

Plaintiff testified that he submitted one administrative appeal regarding his January 31, 2010 encounter with Defendant Medina. It appears that prison staff took Plaintiff's single grievance and assigned it two different log numbers—CTF-10-00374 and CTF-10-00375. (Pl.'s Dep. 111:12–112:7). The first pages of both CTF-10-00374 and CTF-10-00375 are identical and include: a description of Plaintiff's January 31, 2010 encounter with Defendant Medina; the action requested; Defendant Medina's informal level response; and Plaintiff's appeal to the

formal level of review. (ECF No. 124-11 at 60; ECF No. 124-15 at 2).

CTF-10-00374 was screened out at the first level of review as duplicative because it raised the same issues (to have chrono from PVSP honored, to be recognized as wheel chair bound, to have a brace to with walk) as log number CTF-09-13540. (ECF No. 124-15 at 6).

On the other hand, CTF-10-00375 was partially granted at the first level of review. Plaintiff was authorized "to sit outside of his cell upon releases and lockups, at the nearest seat until staff conducts movement due to his medical condition" and a referral was made to health care services regarding Plaintiff's ADA issues. (ECF No. 124-11 at 63). In his appeal to the second level of review, Plaintiff stated he was dissatisfied with the first level response because it rejected his monetary compensation request, his appeal was classified as an ADA issue rather than a staff complaint, and he still had no knee brace or wheelchair. (Id. at 66). In his appeal to the third level of review, Plaintiff stated that the second level response was inadequate because it did not explain how his ADA/health care appeal could be handled by CTF custody staff rather than medical staff and noted that he "still want[s] all relief originally requested." (Id.).

It is undisputed that Plaintiff never filed any grievance regarding the March 2010 incidents. Nor did Plaintiff refer to the March 2010 incidents as he continued his appeal of the January 31st encounter to the second and third levels of review.[11]

The Ninth Circuit has held, regarding continuing violation claims: "That the prior grievance was *related* to his current claim is insufficient" because "to exhaust a continuing violation claim, a plaintiff must put the agency on notice of the continuing nature of the claim." McCollum v. California Department of Corrections & Rehabilitation, 647 F.3d 870, 877 (9th Cir. 2011) (finding complaint was based on discrete incident because plaintiff never filed grievance citing repeated denials or referred back to initial incident in subsequent grievances). As Plaintiff's appeals to the second and third levels of review did not mention Defendant Medina's alleged disregard of Sergeant Ranucci's written authorization, the prison was not on notice of the continuing nature of Defendant Medina's alleged misconduct.

---

[1] Plaintiff's appeals to the second and third level of review were submitted on March 10 and April 7, 2010. (ECF No. 124-11 at 65–66). Although it is unclear when the first March 2010 encounter occurred, it is clear that both March 2010 encounters occurred before Plaintiff submitted his appeal to the third level of review on April 7, 2010.

The Court also finds <u>Griffin v. Arpaio</u>, 557 F.3d 1117 (9th Cir. 2009), instructive. While trying to access an upper bunk, Griffin fell because the prescription drugs he was taking for a mental health condition impaired his vision and depth perception. Griffin filed a grievance, mentioning his mental health conditions and medication, and requested a ladder or some sort of permanent step. While the grievance was pending, Griffin obtained a lower bunk assignment order from a prison nurse. Through multiple levels of appeal, prison officials replied that the nurse's order resolved the grievance. In his complaint in the district court, Griffin asserted that the prison staff disregarded the nurse's order. <u>Id.</u> at 1118–19. The Ninth Circuit held that Griffin failed to exhaust properly because although he alerted the prison to his unsatisfactory bunking situation, "[h]e did not provide notice of the prison staff's alleged disregard of his lower bunk assignments." <u>Id.</u> at 1121. The Ninth Circuit found that the responding prison officials reasonably concluded that the nurse's lower bunk assignment order solved the problem, and Griffin's repeated demands for a ladder "did not 'provide enough information . . . to allow prison officials to take appropriate responsive measures'" regarding the alleged disregard of the nurse's order. <u>Id.</u> (quoting <u>Johnson v. Testman</u>, 380 F.3d 691, 697 (2d Cir. 2004)).

Similarly, here, at the first level of formal review, Sergeant Ranucci partially granted Plaintiff's grievance and authorized Plaintiff "to sit outside of his cell upon releases and lockups, at the nearest seat until staff conducts movement due to his medical condition." (ECF No. 124-11 at 63; Pl.'s Dep. 132:7–19). In his appeals to the second and third levels of review, Plaintiff did not mention Defendant Medina's disregard of Sergeant Ranucci's written authorization. (ECF No. 124-11 at 65–68). Thus, Plaintiff did not provide enough information to allow prison officials to take appropriate responsive measures regarding Defendant Medina's alleged disregard of the written authorization.

Accordingly, the Court finds that Defendants have established that there is no genuine dispute that Plaintiff failed to exhaust his Eighth Amendment claim against Defendant Medina regarding the March 2010 encounters. Therefore, the undersigned recommends granting Defendants' motion for summary judgment as to the Eighth Amendment claim against

1  Defendant Medina arising from the March 2010 encounters.[12]

2          3. Exhaustion under California Government Claims Act for Bane Act Claim

3          California's Government Claims Act[13] requires a tort claim against a public entity or its

4  employees to be presented to the California Victim Compensation and Government Claims

5  Board no more than six months after the cause of action accrues. Cal. Gov't Code §§ 905.2,

6  910, 911.2, 945.4, 950–950.2. Presentation of a written claim, and action on or rejection of the

7  claim are conditions precedent to suit. State v. Superior Court of Kings County (Bodde), 32

8  Cal.4th 1234, 1245 (Cal. 2004); Mangold v. California Pub. Utils. Comm'n, 67 F.3d 1470, 1477

9  (9th Cir. 1995). See Harris v. Escamilla, 736 F. App'x 618, 621–22 (9th Cir. 2018) (applying

10  Government Claims Act requirements to Bane Act claim).

> The Act requires a plaintiff to file a written claim stating "the date, place,
> and other circumstances of the occurrence or transaction which gave rise
> to the claim asserted," Cal. Gov't Code § 910, within six months of the
> accrual of the cause of action, id. § 911.2. "If a plaintiff relies on more
> than one theory of recovery against the state, each cause of action must
> have been reflected in a timely claim." Nelson v. State, 139 Cal.App.3d
> 72, 188 Cal.Rptr. 479, 48  (1982). The Act's purpose "is to provide the
> public entity sufficient information to enable it to adequately investigate
> claims and to settle them, if appropriate, without the expense of litigation."
> Stockett v. Ass'n of Cal. Water Agencies Joint Powers Ins. Auth., 34
> Cal.4th 441, 20 Cal.Rptr.3d 176, 99 P.3d 500, 502 (2004) (internal
> quotation marks omitted).

Mackovski v. City of Garden Grove, 666 F. App'x 649, 654 (9th Cir. 2016).

          With respect to the specificity needed to adequately present a claim as required by the

Government Claims Act, the California Supreme Court has stated:

> The claim, however, need not specify each particular act or omission later
> proven to have caused the injury. A complaint's fuller exposition of the
> factual basis beyond that given in the claim is not fatal, so long as the
> complaint is not based on an "entirely different set of facts." Only where
> there has been a "complete shift in allegations, usually involving an effort
> to premise civil liability on acts or omissions committed at different times

---

[12] Accordingly, the Court declines to address the other grounds raised by Defendants in support of summary judgment with respect to the Eighth Amendment claim against Defendant Medina arising from the March 2010 encounters.

[13] This Act was formerly known as the California Tort Claims Act. City of Stockton v. Superior Court, 42 Cal. 4th 730, 741-42 (Cal. 2007) (adopting the practice of using Government Claims Act rather than California Tort Claims Act).

or by different persons than those described in the claim," have courts
generally found the complaint barred. Where the complaint merely
elaborates or adds further detail to a claim, but is predicated on the same
fundamental actions or failures to act by the defendants, courts have
generally found the claim fairly reflects the facts pled in the complaint.

Stockett v. Ass'n of Cal. Water Agencies Joint Powers Ins. Auth., 34 Cal. 4th 441, 447 (Cal.
2004).

Here, Plaintiff testified that he believes that the California government claim logged as
number G587976 applies to his Bane Act claim against Defendant Medina. (Pl.'s Dep. 152–
156). This government claim was dated January 15, 2010 and filed on January 26, 2010. (ECF
No. 124-5 at 222–23).

Plaintiff's Bane Act claim against Defendant Medina, however, arises out of conduct
that occurred on January 31, 2010 and in March 2010, *after* Plaintiff submitted his government
claim. Plaintiff argues that in government claim number G587976 he alleged he was being
compelled to walk and stand without a wheelchair, walker, or knee brace and that this claim
covers Defendant Medina because Medina later engaged in the same misconduct and Plaintiff
had included Doe employees in his claim. (ECF No. 145 at 20).

The California Supreme Court has recognized that the Government Claims Act is not
satisfied when there is a shift in allegations premising civil liability on acts or omissions
committed at different times or by different persons. See Stockett, 34 Cal. 4th at 447 (citing
Blair v. Superior Court, 218 Cal. App. 3d 221, 226 (Cal. Ct. App. 1990)). In the instant case, the
Bane Act claim involved acts committed at a different time and by a different person than those
described in government claim number G587976 given that Defendant Medina's actions had not
occurred at the time the claim was submitted. Further, in rejecting the claim, the Board wrote,
"Your claim is being accepted only to the extent it asserts allegations that arise from facts or
events that occurred during the six months prior to the date it was presented." (ECF No. 124-5
at 221).

As the factual allegations in government claim number G587976 were insufficient to
present the Bane Act claim against Defendant Medina, Plaintiff has failed to comply with

California's Government Claims Act and thus, the Bane Act claim against Defendant Medina should be dismissed.

## VI.   RECOMMENDATION

Based on the foregoing, the undersigned HEREBY RECOMMENDS that:

> 1.   Defendants' motion to strike (ECF No. 110) be GRANTED;
>
> 2.   Defendants' motion for summary judgment (ECF No. 124) be GRANTED;
>
> 3.   Plaintiff's requests for judicial notice (ECF Nos. 140, 141) be DENIED; and
>
> 4.   This action be CLOSED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within **twenty (20) days** after being served with these findings and recommendations, any party may file written objections with the Court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten (10) days after service of the objections. The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **August 28, 2019**          /s/ Erica P. Grosjean
                                      UNITED STATES MAGISTRATE JUDGE

30